UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANTHONY EVANS,                                    :

          Plaintiff,                         :

     -against-                                   :

CONSUMER INFORMATION & DISPUTE          :
RESOLUTION (CIDR),
                                     :

          Defendant.                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

05 Civ. 8252 (AJP)

**OPINION AND ORDER**

**ANDREW J. PECK, United States Magistrate Judge:**

       Pro se plaintiff Anthony Evans brings this action against his former employer Consumer Information & Dispute Resolution ("CIDR"), pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112 - 12117.  (Dkt. No. 2: Compl. at 1.)  The parties have consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 8.)

       Presently before the Court is defendant CIDR's summary judgment motion.  (Dkt. No. 13.)  For the reasons set forth below, defendant CIDR's summary judgment motion is GRANTED.

**FACTS**

**Evans' Employment at CIDR**

       Evans began working at CIDR on July 15, 2003 as a full time security guard at CIDR's facility at 186 East 123rd Street, New York, New York (the "Step-Up Facility").  (Dkt. No. 13: 2/9/06 Howe Aff. Ex. E: Evans Dep. at 9-12; Dkt. No. 15: CIDR 56.1 Stmt. ¶ 7; Dkt. No. 13:

Cilento Aff. ¶ 7.)  Evans was assigned an 11:00 p.m. to 7:00 a.m. shift.  (Cilento Aff. ¶ 7; Evans

Dep. at 12; CIDR 56.1 Stmt. ¶ 17.)  His responsibilities there included the following:

- Operate and monitor alarm and closed-circuit television systems
- Receive visitors and give information
- Take action in emergency situations such as illness, safety hazards, or other unusual situations
- Observe and report from a distance while on a walking patrol and by closed-circuit television
- Check windows, doors, and keep aware of unauthorized individuals in an area
- Make sure that electrical and plumbing systems, alarms, and sprinkler systems are on or working properly
- Keep in radio contact with other Safety Coordinators on patrol
- Thoroughly search areas when anything unusual is noticed
- Report to the proper authority: program director, police, fire department, building office, etc. when anything unusual or any potential problem
- File written reports after action has been taken to correct the situation
- May use computers to store security information, including suspicious happenings and names of visitors

(Dkt. No. 16: Evans 2/22/06 Opp. Aff. Ex. at 000113; Cilento Aff. ¶ 8 & Ex. A; CIDR 56.1 Stmt.

¶ 12.)  In January 2004, CIDR promoted Evans to security supervisor, which required him to perform

his security guard duties as well as oversee the other security staff at the Step-Up Facility during his

shift.  (Cilento Aff. ¶ 11; Evans Dep. at 12-13; CIDR 56.1 Stmt. ¶¶ 18-19.)

"CIDR is a not-for-profit low income housing organization that houses approximately

400 homeless men and women in three facilities throughout New York City.  Many of the clients that

CIDR assists are chronically homeless and chemically dependent individuals who are unable to take

care of themselves."  (Cilento Aff. ¶ 4; see also CIDR 56.1 Stmt. ¶¶ 1-2.)  CIDR is under contract

with New York City's Department of Homeless Services to house and care for these individuals,

which requires CIDR to maintain a safe and secure environment through a twenty-four hour security presence at its facilities. (Cilento Aff. ¶ 5; CIDR 56.1 Stmt. ¶¶ 3-4.) Security at the facilities is essential because it is not uncommon for some of CIDR's clients to occasionally become violent and attempt to do harm to themselves or others. (Cilento Aff. ¶ 6; CIDR 56.1 Stmt. ¶¶ 5-6.)

**Events Leading Up to Evans' Termination**

Evans alleges that he is disabled because he has a "psychosis." (Dkt. No. 2: Compl. ¶ 7; Dkt. No. 16: Evans 2/22/06 Opp. Aff. ¶¶ 1-2.) However, this alleged disability never prevented Evans from working; Evans testified at his deposition that he has "always been able to work." (Dkt. No. 13: 2/9/06 Howe Aff. Ex. E: Evans Dep. at 10; see also id. at 43, 67, 70; Dkt. No. 15: CIDR 56.1 Stmt. ¶¶ 10-11; see also page 8 below concerning Evans' other job.) Evans claims that CIDR fired him because of this alleged disability. (Compl. ¶ 8.)

On September 13, 2003, the CIDR supervisor on duty completed a Staff Shift Report on Evans, stating that Evans was "nowhere to be found" during a 5:15 a.m. round of the facility. (Dkt. No. 13: Cilento Aff. ¶ 14 & Ex. B; CIDR 56.1 Stmt. ¶ 23.)[1/] The supervisor noted that Evans possessed the house keys needed to unlock the front door at 6:00 a.m. (Cilento Aff. Ex. B.)

On November 29, 2003, Roger Patterson of CIDR completed a disciplinary report on Evans, stating that on November 28, 2003, Evans failed to report for duty as scheduled, that he had

---

[1/]   Evans disputes many of the absences relied upon by CIDR. (Evans 2/22/06 Opp. Aff. at 4-8; Dkt. No. 26: Evans 4/7/06 Opp. Aff.). The Court will not elaborate on Evans' claims in this section because, as discussed below, these fact disputes are not material to the summary judgment decision, since Evans has not shown that he is "disabled" within the meaning of the ADA.

been warned multiple times about his tardiness, and that this was his "final warning." (Cilento Aff. ¶ 15 & Ex. C; CIDR 56.1 Stmt. ¶ 24.)

On April 12, 2004, Evans' supervisor, Tony Jones, wrote a memorandum stating that Evans was scheduled to work from 11:00 p.m. on April 9 until 7:00 a.m. on April 10, but that Evans abandoned his post at 3:30 a.m., taking the facility keys with him, and did not return until 7:05 a.m., appearing high or intoxicated. (Cilento Aff. ¶ 16 & Ex. D; CIDR 56.1 Stmt. ¶ 25.) According to Jones' memorandum, Evans admitted that he had used drugs, agreed that he needed treatment, and was referred to CIDR's human resources office for assistance in obtaining treatment. (Cilento Aff. ¶ 17 & Ex. D; CIDR 56.1 Stmt. ¶ 27.) Evans was suspended from work while he located a treatment program, and was informed that his supervisor position would be reconsidered. (Id.) Evans testified at his deposition that he signed the bottom of this memorandum. (Dkt. No. 20: 3/10/06 Howe Aff. Ex. B: Evans Dep. at 25; 3/10/06 Howe Aff. Ex. C.)[2/]

On May 15, 2004, Medical Arts Center Hospital sent a letter to CIDR stating that Evans was treated in its detoxification program from May 11, 2004 to May 15, 2004. (Cilento Aff. ¶ 18 & Ex. E; CIDR 56.1 Stmt. ¶ 28.) The letter noted that Evans could benefit by attending Alcoholics Anonymous/Narcotics Anonymous. (Cilento Aff. Ex. E.)

---

[2/] Although Evans saw this document during his deposition and testified that his signature appears at the bottom of it, he now claims that the first time he saw this document was when he received CIDR's summary judgment papers, and states that his signature was forged. (See Dkt. No. 22: Evans 3/17/06 Aff.) The issue of whether Evans signed this memorandum is not relevant to decision of this summary judgment motion.

On July 2, 2004, Tony Jones e-mailed CIDR supervisors, stating:

> At 12:10 a.m. CCM Patterson was informed that Supervisor Anthony Evans did not return to facility nor did he call said writer concerning his whereabouts. CCM notified Program Dir. Via voicemail, and spoke with Dir. Of Security Tony Jones. CCM was informed by Dir. Of Safety that Mr. Evans is not to report to work until he speaks to Dir. Tony Jones.
>
> Note: Mr. Evans wife has been calling the facility throughout the 11x7 tour concerning Mr. Evans whereabouts.
>
> PLEASE GET BACK TO ME MY RECOMMENDATION IS TERMINATION.

(Cilento Aff. ¶ 19 & Ex. F; CIDR 56.1 Stmt. ¶ 29.) On July 17, 2004, Tony Jones e-mailed CIDR supervisors, stating:

> Hi Gloria Anthony Evans has done it again. His wife has called me asking "what are his hours." He was a no call no show last night 7-16-04. His wife called me several [times] weeping in the early morning wondering if I had heard from him. Guys I can not run this facility with guys like this. Therefore my recommendation is termination. I have also told staff not to let him into the facility until he speaks to me or Mr. Morris. I have left messages on your phone as well as Dean Morris concerning this matter please get back to me via e-mail or via cell letting me know you have received this correspondence.

(Cilento Aff. ¶ 20 & Ex. G; CIDR 56.1 Stmt. ¶ 30.)

On September 10, 2004, a CIDR supervisor wrote a disciplinary report stating that at approximately 1:00 a.m., Evans called and stated that he was going to the store and would be right back, and that approximately two hours later Evans called and said that he would be back to work soon, but he never came back. (Cilento Aff. ¶ 21 & Ex. H; CIDR 56.1 Stmt. ¶¶ 31-32.)[3]

---

[3] On September 16, 2004, Henry Fury of CIDR e-mailed a CIDR supervisor stating that "[i]n connection with my conversation with Ms. Washington she confirmed that on the evening
(continued...)

Evans did not return to work until September 16, 2004, at which time he reported to Gloria Mellone that he had been hospitalized; Ms. Mellone required that he provide documentation. (Cilento Aff. ¶ 22; CIDR 56.1 Stmt. ¶¶ 33-36.)

On October 5, 2004, Gloria Mellone sent a letter to Evans stating that "[i]t is with regret that we must terminate your employment from Consumer Information and Dispute Resolution, effective September 30, 2004." (Evans 2/22/06 Opp. Aff. Ex.)

On October 26, 2004, Gloria Mellone sent a memo to a CIDR supervisor summarizing the events that led to Evans' termination. (Cilento Aff. ¶ 24 & Ex. I; CIDR 56.1 Stmt. ¶¶ 33-39.) The memo stated that on September 13, 2004, Joe Morris notified her via e-mail that Evans left the job on September 11, 2004 at 1:00 a.m. (Cilento Aff. Ex. I.) Evans called two hours after leaving to say that he was returning to work, but he never returned. (Id.) On or about September 16, 2004, Evans gave Mellone a document from Presbyterian Hospital stating that Evans was in the emergency room on September 11, 2004, was admitted on September 12, 2004, and discharged on September 16, 2004. (Id.) Mellone explained to Evans that it was important to document the time he was admitted to the emergency room on September 11, 2004 to prove why he was unable to return to work on September 11 and that Mellone could not allow Evans to return to

---

[3]/ (...continued)
in question Mr. Evans told her he was stepping out to get a sandwich, and that he would be right back. He did not return immediately, but he did call a couple of hours later, to say that he was on his way back to the facility, he mentioned nothing about going to a hospital." (Dkt. No. 16: Evans 2/22/06 Opp. Aff. Ex. at 000015.)

work until he did.  (Id.)  On October 20, 2004, Mellone learned from the hospital that Evans was admitted at 7:09 a.m. on September 12, 2004.  (Cilento Aff. ¶ 24 & Ex. I; CIDR 56.1 Stmt. ¶ 38.)

**CIDR Logbooks**

Evans claims that information entered into logbooks kept by CIDR refute the information contained in CIDR's personnel records regarding his absences from work described above.  (Dkt. No. 16: Evans 2/22/06 Opp. Aff. at 4-5.)  However, a review of copies of the logbooks submitted by CIDR reveals that Evans made no entries at all on November 28-29, 2003, July 1-2, 2004,  July 16-17, 2004, and September 10-11, 2004.  (Dkt. No. 23: 3/17/06 Howe Ltr. Ex. C at 000211-12, 000216-17, 000218-20.)  While Evans made entries in the logbooks on September 12-13, 2003 and April 9-10, 2004, those entries do not reflect the time of day made, and thus offer no additional information as to whether Evans worked his full shift on those days.  (Id. at 000208-10, 000213-15.)  Notably, an entry in the logbooks dated September 10, 2004 notes that "ADS Evans left the facility at approx. 1:00 AM and never return[ed]."  (Id. at 000220.)

In addition to the logbooks that CIDR submitted, Evans submitted copies from a different set of CIDR security logbooks (obtained pursuant to New York's Freedom of Information Law), claiming that they refute the disciplinary information in Evans' personnel file.  (Dkt. No. 26: Evans 4/7/06 Opp. Aff.)  However, none of the pages that Evans provided from the security logbooks

correspond to the dates on which CIDR claims that Evans was absent from work. (See Evans 4/7/06 Aff. Ex. at 1-79.)[4/]

**Evans' Other Employment History**

At the same time he was working full time for CIDR, Evans also worked full time as a security guard for another company, FJC. (Dkt. No. 13: 2/9/06 Howe Aff. Ex. E: Evans Dep. at 9; Dkt. No. 15: CIDR 56.1 Stmt. ¶ 8.) Evans began working at FJC on January 5, 2001 and continues to work there currently. (Evans Dep. at 8-9; CIDR 56.1 Stmt. ¶ 9.) On March 19, 2001, Evans was promoted to supervisor at FJC and since that time he has received another promotion so that he now works for FJC as a security guard "in the corporate building." (Evans Dep. at 8.) Evans testified that his alleged disability never interfered with his work at FJC. (Id. at 10.)

---

[4/] The Court notes that these security logbooks were requested by Evans' discovery requests, which the parties discussed with the Court at a January 18, 2006 status conference. (See Dkt. No. 17: 1/18/06 Conf. Tr. 3-6, 18-19.) Counsel for CIDR and Dean Morris, a CIDR representative, explicitly stated on the record that the security logbooks for the time period in question did not exist anymore. (Id. at 5-6.) Morris also stated in a sworn affidavit that the security logbooks for the appropriate time period were missing from CIDR's corporate offices. (Dkt. No. 13: Morris Aff. ¶ 7.) While Evans has not submitted copies from the logbooks for the specific dates in question, he has submitted copies of the logbook from the September 2003 - July 2004 time period, which he obtained through a FOIL request. (See Dkt. No. 26: Evans 4/7/06 Opp. Aff. Ex. at 1-79.) This strongly suggests that CIDR has not been completely forthcoming during discovery. The discovery issues concerning the security logbooks have no effect on this summary judgment decision, however, because the Court grants defendant's motion solely on grounds relating to Evans' alleged disability, and does not reach any issue regarding CIDR's reason for terminating Evans.

**Evans' Medical Records**[5]

On May 11, 2004, Evans was admitted to the Medical Arts Center Hospital for alcohol and cocaine detoxification. (Dkt. No. 16: Evans 2/22/06 Opp. Aff. Ex. at 000075-76.) Evans was discharged on May 15, 2004 with final diagnoses of alcohol and cocaine dependence. (Id.) Dr. Robert Weeden, the attending physician, noted that "[t]he patient did well on detoxification protocol." (Id. at 000076) Dr. Weeden also noted that Evans' "clinical condition improved and at the time of discharge, he was alert, oriented, asymptomatic, off medications. His medical condition was fully explained to him, particularly the need for outpatient follow-up with his primary care physician or medical clinic within one week of discharge." (Id.) Evans gave his consent on May 12,

---

[5]    CIDR argues that the medical records that Evans submitted cannot be considered by the Court in deciding this summary judgment motion because they are unsworn statements. (Dkt. No. 14: CIDR SJ Br. at 10.) CIDR's argument is misplaced. "Medical records, including psychiatric records, can be admissible under Federal Rule of Evidence 803(6), provided they are prepared in the regular course of business, near the time of occurrence, by a person with knowledge and are properly authenticated." Hodges v. Keane, 886 F. Supp. 352, 356 (S.D.N.Y. 1995) (Sotomayor, D.J.) (citing Romano v. Howarth, 998 F.2d 101, 108 (2d Cir. 1993). "However, if the source of information or the method or circumstances of preparation indicate lack of trustworthiness, such records may be excluded." Hodges v. Keane, 886 F. Supp. at 356. Moreover, hospital records made for purposes of medical diagnosis or treatment are admissible under Federal Rule of Evidence 803(4). See, e.g., White v. Illinois, 502 U.S. 346, 356, 112 S. Ct. 736, 743 n.8 (1992); United States v. Santiago, 199 F. Supp. 2d 101, 108 (S.D.N.Y. 2002); Hodges v Keane, 886 F. Supp at 356; Lewis v. Velez, 149 F.R.D. 474, 484 n.5 (S.D.N.Y. 1993). A review of the submitted medical records, which were obtained by CIDR pursuant to signed releases by Evans under the Health Information Portability and Accountability Act of 1996, reveals nothing that would indicate lack of trustworthiness. The Court will consider the medical records for purposes of this summary judgment motion.

2004 for the Medical Arts Center Hospital to release verbal information about this hospital stay to Gloria Mallone of CIDR.  (Id. at 000071.)

In a Mental Status Screening at the Medical Arts Center Hospital on May 12, 2004, Evans had a well groomed appearance, a pleasant or modulated quality of speech, an appropriate affect and mood, his facial expression suggested calmness, his predominate mood was appropriate to circumstances, his general body movements were appropriate, his perception was oriented to reality, his intellectual functioning was appropriate, his memory recall was intact, he was oriented to person, place and time, his thought content was appropriate, he had difficulty acknowledging problems, his thought flow appeared congruent, he had an impaired ability to manage daily living, and he had a cooperative relationship to the evaluator.  (Id. at 000095.)

On a psychosocial assessment form that Evans completed on May 12, 2004, Evans stated that he did not have any chronic medical problems that continued to interfere with his life. (Id. at 000088.)  Evans stated he had an eleventh grade education, no one contributed to his financial support, and that his usual employment status within the past year was working full time at a security position.  (Id. at 000089.)  Evans stated that he drank approximately half a pint of liquor per day and smoked approximately $300.00 of crack per day since at least 2001.  (Id. at 000090.)  Evans noted that he had been treated for alcohol and drug abuse three times before.  (Id.)  Evans stated that he did not have any current psychiatric conditions.  (Id. at 000093.)  In the 30 days previous to May 12, 2004, Evans experienced depression, visual hallucinations, hearing voices, trouble remembering,

trouble controlling violent behavior, serious thoughts of homicide, and attempts at homicide.  (Id.)  The assessing counselor noted that Evans had no psychiatric history or status.  (Id. at 000094.)

On September 12, 2004, Evans was admitted to Columbia Presbyterian Medical Center.  (Id. at 000117.)  The Court emphasizes that CIDR was not aware of the information from the September 2004 hospital records until after it had fired Evans (indeed, until discovery in this action).  Evans' chief complaint upon admittance was that "'[his] boss was going to take [his] job,'" that he was hearing voices and they were getting loud, and that the voices were telling him to "kill or be killed."  (Id. at 000119, 000128.)  Evans stated that he had recently come to believe that his boss did not like him.  (Id. at 000119.)  Evans indicated that because his boss was an ex-cop, his boss had clout and Evans felt like he had no option but to kill himself or his boss and expected that he would be more likely to kill his boss.  (Id.)  Additionally, Evans stated that his boss was always talking about him and that he believed that ever since he was in the hospital emergency room, his boss was "talking trash" about him.  (Id.)  Evans denied racing thoughts, recent impulsivity, or irritability, but stated that he only slept two to three hours in a twenty-four hour period, which he had done for "years."  (Id.)  On September 12, 2004, Evans tested positive for cocaine.  (Id. at 000165, 000199.)

On September 13, 2004, the attending physician noted that Evans was calm and cooperative, but remained upset about the situation with his boss, Tony Jones.  (Id. at 000122.)  Evans was convinced that Jones had been in the emergency room the night before when Evans was there, and could not be reassured about this.  (Id.)  Evans reported a history of violence but said that

he worked as a security guard and knew the importance of maintaining control and not being violent. (Id.) The attending physician also noted that currently Evans was "frankly psychotic and homicidal towards [his] boss," and that Evans needed admission for treatment of psychosis and for the safety of his boss. (Id.)

On September 13, 2004, the attending physician completed an initial psychiatric assessment of Evans. (Id. at 000132-46.) The admitting physician repeated Evans' initial complaint of hearing voices, and noted further that Evans was lethargic, his mood was "alright," his judgment was fair, his affect was blunted, his insight was impaired although he understood the necessity for his hospital admission, he had no thought disorder present, he had paranoid and persecutory ideas and auditory hallucinations, was oriented to time, place and person, and his memory was not impaired. (Id. at 000137-39.) The attending physician listed Rispendal as Evans' medication. (Id. at 000140.) Evans scored 29 out of 30 possible points on a "Mini Mental Status Exam," which tested his orientation, registration, attention and calculation, recall, and language skills. (Id. at 000143.) The initial psychiatric assessment noted that Evans had a prior admittance for auditory hallucinations in the 1980's, and had a history of violence. (Id. at 000144.) The initial psychiatric assessment stated that Evans' admitting diagnosis was psychosis not otherwise specified, mood disorder not otherwise specified, and cocaine abuse. (Id. at 000145.)

Evans was discharged from Columbia Presbyterian on September 16, 2004. (Id. at 000202-04.) In a discharge summary note dated September 16, 2004, attending physician Dr. Giovanny Nunez stated that Evans' hospital course was as follows:

The patient was admitted to 3 River East and he was started on psychiatric medications including Risperidone 1 mg p.o. b.i.d. He was also considered to be started on antidepressants which after a few days of admission, it was decided that patient was not really depressed but crashing from cocaine use. On 9/16/04, the patient submitted a 72 hour letter requesting to be released. He has shown significant improvement and recompensated quickly, sober from cocaine, very demanding, irritable, angry at times. He shows signs of antisocial personality structure. He was very manipulative and entitled. He tolerated medications with no side effects.

Minimal insight into substance abuse. He is at a high risk for a relapse given his poor insight and unwillingness to be referred to inpatient rehab program as recommended. He is not suicidal, not homicidal, no auditory or visual hallucinations.

(Id. at 000203.) Evans' discharge diagnoses were: "Axis I: Substance Induced Mood Disorder, Substance Induced Psychosis, Cocaine Dependence. Axis II: Antisocial Personality Disorder. Axis III: Neurofibramatosis and Heart Murmur. Axis IV: Family Conflicts and Work Related Problems. Axis V: 58." (Id. at 000203-04.)

## ANALYSIS

I. **LEGAL PRINCIPLES GOVERNING DISCRIMINATION CASES**

A. **Summary Judgment Standards in Employment Discrimination Cases**[6/]

---

[6/] For additional cases authored by this Judge discussing the summary judgment standard in employment discrimination cases in language substantially similar to that in this entire section of this Opinion, see, e.g., Ferrer v. Potter, 03 Civ. 9113, 2005 WL 1022439 at *2-4 (S.D.N.Y. May 3, 2005) (Peck, M.J.); Williams v. City of New York, 04 Civ. 1993, 2005 WL 839103 at *2-7 (S.D.N.Y. Apr. 12, 2005) (Peck, M.J.); Heskin v. Insite Adver., Inc., 03 Civ. 2508, 2005 WL 407646 at *10-16 (S.D.N.Y. Feb. 22, 2005) (Peck, M.J.); Taylor v. Potter, 99 Civ. 4941, 2004 WL 1811423 at *9-14 (S.D.N.Y. Aug. 16, 2004) (Peck, M.J.), aff'd, 148 Fed. Appx. 33 (2d Cir. 2005); Dodson v. CBS Broad., Inc., 02 Civ. 9270, 2004 WL 1336231 at *15-21 (S.D.N.Y. June 15, 2004) (Peck, M.J.); Slaitane v. Sbarro, Inc., 03 Civ. 5503, 03 Civ. 5504, 2004 WL 1202315 at *7-12 (S.D.N.Y. June 2, 2004) (Peck, M.J.);
(continued...)

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), cert. denied, 540 U.S. 811, 124 S. Ct. 53 (2003); Lang v. Retirement Living Pub. Co., 949 F.2d 576, 580 (2d Cir. 1991).

---

[6]/    (...continued)
Diaz v. Weill Med. Ctr. of Cornell Univ., 02 Civ. 7380, 2004 WL 285947 at *13-17 (S.D.N.Y. Feb. 13, 2004) (Peck, M.J.), aff'd, 138 Fed. Appx. 362 (2d Cir. 2005); Viruet v. Citizen Advice Bureau, 01 Civ. 4594, 2002 WL 1880731 at *8-13 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.); Brown v. Cushman & Wakefield, Inc., 01 Civ. 6637, 2002 WL 1751269 at *12-13, 20-22 (S.D.N.Y. July 29, 2002) (Peck, M.J.), report & rec. adopted, 235 F. Supp. 2d 291 (S.D.N.Y. 2002) (Berman, D.J.); Kennebrew v. New York Hous. Auth., 01 Civ. 1654, 2002 WL 265120 at *6-10 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.); Williams v. NYC Dep't of Sanitation, 00 Civ. 7371, 2001 WL 1154627 at *8-12 (S.D.N.Y. Sept. 28, 2001) (Peck, M.J.); Gonzalez v. New York City Transit Auth., 00 Civ. 4293, 2001 WL 492448 at *6, 10 (S.D.N.Y. May 9, 2001) (Peck, M.J.); Economou v. Caldera, 99 Civ. 12117, 2000 WL 1844773 at *12 (S.D.N.Y. Dec. 18, 2000) (Peck, M.J.); Cobian v. New York City, 99 Civ. 10533, 2000 WL 1782744 at *7, 11 (S.D.N.Y. Dec. 6, 2000) (Peck, M.J.), aff'd, 23 Fed. Appx. 82 (2d Cir. 2001); Austin v. Ford Models, Inc., 95 Civ. 3731, 2000 WL 1752966 at *6, 8 (S.D.N.Y. Nov. 29, 2000) (Peck, M.J.), aff'd, 22 Fed. Appx. 76 (2d Cir. 2001), cert. denied, 537 U.S. 848, 123 S. Ct. 189 (2002); Johns-Davila v. City of New York, 99 Civ. 1885, 2000 WL 1725418 at *3 (S.D.N.Y. Nov. 20, 2000) (Peck, M.J.); Weber v. Parfums Givenchy, Inc., 49 F. Supp. 2d 343, 352, 354 (S.D.N.Y. 1999) (Wood, D.J. & Peck, M.J.); Douglas v. Victor Capital Group, 21 F. Supp. 2d 379, 387 (S.D.N.Y. 1998) (Stein, D.J. & Peck, M.J.); Hernandez v. New York City Law Dep't Corp. Counsel, 94 Civ. 9042, 1997 WL 27047 at *6, 12 (S.D.N.Y. Jan. 23, 1997) (Peck, M.J.).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment – here, defendant. See, e.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. See, e.g., Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S. Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587, 106 S. Ct. at 1356; see also, e.g., Weinstock v. Columbia Univ., 224 F.3d at 41 (at summary judgment, "[t]he time has come . . . 'to put up or shut up'") (citation omitted).

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. at 255, 106 S. Ct. at 2513.[7]

---

[7] See also, e.g., Feingold v. New York, 366 F.3d 138, 148 (2d Cir. 2004); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 36; Gallo v. Prudential Residential Servs., Ltd. P'Ship, 22 F.3d at 1223.

The Court draws all inferences in favor of the non-moving party only after determining that such inferences are reasonable, considering all the evidence presented.  See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 252 (2d Cir.), cert. denied, 484 U.S. 977, 108 S. Ct. 489 (1987).  "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact.  See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986), cert. denied, 480 U.S. 932, 107 S. Ct. 1570 (1987).  To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510.  While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 248, 106 S. Ct. at 2510 (citation omitted); see also, e.g., Knight v. United States Fire Ins. Co., 804 F.2d at 11-12.

When a case turns on the intent of one party, as employment discrimination claims often do, a "trial court must be cautious about granting summary judgment."  Gallo v. Prudential

Residential Servs., Ltd. P'Ship, 22 F.3d at 1224.[8/] Because the employer rarely leaves direct evidence of its discriminatory intent, the Court must carefully comb the available evidence in search of circumstantial proof to undercut the employer's explanations for its actions. E.g., Gallo v. Prudential Residential Srvs., Ltd. P'Ship, 22 F.3d at 1224. "[S]ummary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted). Nonetheless, when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the Court may conclude that no material issue of fact exists and it may grant summary judgment to the employer. E.g., Budde v. H&K Distrib. Co., No. 99-9449, 216 F.3d 1071 (table), 2000 WL 900204 at *1 (2d Cir. June 29, 2000); Stern v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Meloff v. New York Life Ins. Co., 51 F.3d 372, 375 (2d Cir. 1995). In other words, to defeat summary judgment, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational

---

[8/]     Accord, e.g., Feingold v. New York, 366 F.3d at 149; Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998) ("in an employment discrimination case when, as here, the employer's intent is at issue, the trial court must be especially cautious about granting summary judgment"); McLee v. Chrysler Corp., 109 F.3d 130, 135 (2d Cir. 1997) ("caution must be exercised in granting summary judgment where motive is genuinely in issue"); Cardoza v. Healthfirst, Inc., 98 Civ. 3050, 1999 WL 782546 at *1-2 (S.D.N.Y. Sept. 30, 1999); see also, e.g., Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 40.

finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia Univ., 131 F.3d at 312; see, e.g., Schnabel v. Abramson, 232 F.3d 83, 90-91 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d at 42 (The question on summary judgment is "whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination.  To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.") (internal quotations & alterations omitted); Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996) (plaintiff must "produce not simply 'some' evidence, but 'sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not [discrimination] was the real reason for the discharge'").[9/]   Indeed, the Second Circuit "went out of [its] way to remind district courts that the 'impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable.'"  Weinstock v. Columbia Univ., 224 F.3d at 41.

###### B. Legal Principles Governing ADA Actions

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job

---

[9/]     See also, e.g., Budde v. H&K Distrib. Co., 2000 WL 900204 at *1; Scaria v. Rubin, 94 Civ. 3333, 1996 WL 389250 at *5 (S.D.N.Y. July 11, 1996) (Peck, M.J.), aff'd, 117 F.3d 652, 654 (2d Cir. 1997).

training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In connection with discriminatory discharge claims under the ADA, the Second Circuit applies the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). See, e.g., Sista v. CDC Ixis N. Am., Inc., No. 05-1506-CV, 05-1625-CV, --- F.3d ---, 2006 WL 956958 at *6 (2d Cir. Apr. 13, 2006); Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 118 n.3 (2d Cir. 2004); Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48-49 (2d Cir.), cert. denied, 537 U.S. 813, 123 S. Ct. 74 (2002); Garcia v. S.U.N.Y. Health Sci. Ctr., 280 F.3d 98, 112 (2d Cir. 2001); Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998).

Under the familiar McDonnell Douglas burden-shifting analysis, the plaintiff has the burden at the outset of "proving by the preponderance of the evidence a prima facie case of discrimination." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973).[10] Establishment of a prima facie case "'in effect creates a presumption that the employer

---

[10] See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3, 124 S. Ct. 513, 517 n.3 (2003); O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 310, 116 S. Ct. 1307, 1309 (1996); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507, 113 S. Ct. 2742, 2746-47 (1993); Mandell v. County of Suffolk, 316 F.3d 368, 377-78 (2d Cir. 2003); Mario v. P&C Food Mkts., Inc., 313 F.3d 758, 767 (2d Cir. 2002); Collins v. New York City Transit Auth.,
(continued...)

unlawfully discriminated against the employee.'" St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506, 113 S. Ct. at 2747 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 254, 101 S. Ct. at 1094).[11]

Once a plaintiff claiming employment discrimination establishes a prima facie case, the burden shifts to the defendant to rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for its employment decision. E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106; McDonnell Douglas Corp. v. Green, 411 U.S. at 802, 93 S. Ct. at 1824.[12] The burden on the defendant at this phase is one of production

---

[10] (...continued)
305 F.3d 113, 118 (2d Cir. 2002); Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000); Austin v. Ford Models, Inc., 149 F.3d 148, 152 (2d Cir. 1998), abrogated on other grounds by Swierkiewicz v. Soreona N.A., 534 U.S. 506, 122 S. Ct. 992 (2002); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

[11] See also, e.g., Mandell v. County of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997).

[12] See also, e.g., Raytheon Co. v. Hernandez, 540 U.S. at 50 n.3, 124 S. Ct. at 517 n.3; O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. at 310, 116 S. Ct. at 1309; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 506-07, 113 S. Ct. at 2747; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253-54, 101 S. Ct. at 1093-94; Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004); Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Mandell v. County of Suffolk, 316 F.3d at 380; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Schnabel v. Abramson, 232 F.3d at 88; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Austin v. Ford Models, Inc., 149 F.3d at 152; Stein v. Trustees of Columbia Univ., 131 F.3d 305, 312 (2d Cir. 1997); Scaria v. Rubin, 117 F.3d at 654; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d at 38.

rather than persuasion.  E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142, 120 S. Ct. at 2106.[13/]

"Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106.

If the defendant articulates a non-discriminatory reason, the McDonnell Douglas burden-shifting framework drops out of the picture.  E.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 142-43, 120 S. Ct. at 2106.[14/]  "Moreover, although the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 143, 120 S. Ct. at 2106 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 255 n.10, 101 S. Ct. at 1095 n.10).

---

[13/]  See also, e.g., St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 507, 113 S. Ct. at 2747; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 257, 101 S. Ct. at 1096; Terry v. Ashcroft, 336 F.3d at 144 n.17; Austin v. Ford Models, Inc., 149 F.3d at 153; Scaria v. Rubin, 117 F.3d at 654.

[14/]  See also, e.g., Raytheon Co. v. Hernandez, 124 S. Ct. at 517 n.3; St. Mary's Honor Ctr. v. Hicks, 509 U.S. at 510, 113 S. Ct. at 2749; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. at 253, 101 S. Ct. at 1093-94; Feingold v. New York, 366 F.3d at 152; Mandell v. County of Suffolk, 316 F.3d at 380-81; Mario v. P&C Food Mkts., Inc., 313 F.3d at 767; Weinstock v. Columbia Univ., 224 F.3d at 42; Scaria v. Rubin, 117 F.3d at 654.

The Supreme Court in 2000 clarified the standard at this stage of the <u>McDonnell Douglas</u> analysis:

> [I]n <u>St. Mary's Honor Center</u> . . . . we held that the factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not <u>compel</u> judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." In other words, "[i]t is not enough . . . to <u>dis</u>believe the employer; the factfinder must <u>believe</u> the plaintiff's explanation of intentional discrimination."
>
> In reaching this conclusion, however, we reasoned that it is <u>permissible</u> for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . .
>
> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, <u>a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated</u>.
>
> <u>This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability</u>. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50 [or Rule 56], and

we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

> Whether judgment as a matter of law [or summary judgment] is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 146-49, 120 S. Ct. at 2108-09 (emphasis added & citations omitted).

After Reeves, the Second Circuit has made clear that merely proving a prima facie case and disproving the employer's explanation for its conduct at the third step of the McDonnell Douglas analysis will not preclude summary judgment in all cases; rather, a case-by-case analysis is necessary:

> In examining the impact of Reeves on our precedents, we conclude that Reeves prevents courts from imposing a per se rule requiring in all instances that a[n ADA] claimant offer more than a prima facie case and evidence of pretext. . . . But the converse is not true; following Reeves, we decline to hold that no [ADA] defendant may succeed on a summary judgment motion so long as the plaintiff has established a prima facie case and presented evidence of pretext. Rather, we hold that the Supreme Court's decision in Reeves clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff."

Schnabel v. Abramson, 232 F.3d at 90 (emphasis added).[15/]

---

[15/]    See also, e.g., Feingold v. New York, 366 F.3d at 152; Roge v. NYP Holdings, Inc., 257 F.3d 164, 167-68 (2d Cir. 2001); Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 469-70 (2d Cir.), cert. denied, 534 U.S. 993, 122 S. Ct. 460 (2001); James v. New York Racing Ass'n, 233 F.3d 149, 156-57 (2d Cir. 2000); Weinstock v. Columbia Univ., 224 F.3d at 42 ("In (continued...)

## II. CIDR'S SUMMARY JUDGMENT MOTION IS GRANTED BECAUSE EVANS CANNOT ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION UNDER THE ADA

The Americans with Disabilities Act prohibits discrimination by covered employers "against a qualified individual with a disability." 42 U.S.C. § 12112(a). "To establish a prima facie case of discrimination under the ADA, plaintiff must show by a preponderance of the evidence that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc., 198 F.3d 68, 72 (2d Cir. 1999).[16]

---

[15] (...continued)
short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."); Aksamit v. 772 Park Avenue Corp., 00 Civ. 5520, 2003 WL 22283813 at *6 (S.D.N.Y. Oct. 2, 2003) ("[A] plaintiff's establishment of a prima facie case and rebuttal of a nondiscriminatory reason for the adverse action do not save the plaintiff from summary judgment when there is insufficient evidence of discrimination."), aff'd, 128 Fed. Appx. 204 (2d Cir. 2005); Weiser v. Forest Pharm., Inc., 99 Civ. 1809, 2001 WL 293951 at *7-8 (S.D.N.Y. Mar. 26, 2001); Tanay v. Saint Barnabas Hosp., 99 Civ. 9215, 2001 WL 262695 at *4 (S.D.N.Y. Mar. 15, 2001); Bennett v. Watson, Wyatt & Co., 136 F. Supp. 2d 236, 245 (S.D.N.Y.), reconsideration denied, 156 F. Supp. 2d 270 (S.D.N.Y. 2001), aff'd in part, appeal dismissed on other grounds, 51 Fed. Appx. 55 (2d Cir. 2002); Connell v. Consolidated Edison Co., 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000) (Chin, D.J.) ("The key is whether there is sufficient evidence in the record – whether it consists of just the prima facie case and proof of pretext alone or those items together with additional evidence – to support an inference of discrimination.").

[16] Accord, e.g., Sista v. CDC Ixis N. Am., Inc., No. 05-1506-CV, 05-1625-CV, --- F.3d ---, 2006 WL 956958 at *6 (2d Cir. Apr. 13, 2006); Nader v. ABC Television, Inc., 150 Fed.
(continued...)

**A.**     **Evans Was Not Disabled Within The Meaning of The ADA Because He Was An Active Cocaine User At The Time Of His Termination**

While CIDR asserts that Evans was fired because of his record of excessive absenteeism and failing to submit documentation explaining the last time that he did not report for work as scheduled (see Dkt. No. 14: CIDR SJ Br. at 19), Evans stresses that CIDR was well aware of his psychosis and that CIDR terminated him on that basis alone (Dkt. No. 16: Evans 2/22/06 Opp. Aff. at 2, 5).  However, even if CIDR fired Evans based solely because of his substance induced psychosis, this cannot be the basis of an ADA claim because it was directly related to Evans' current use of cocaine around the time of his termination.  (See pages 9-13 above.)

A "'qualified individual with a disability'" under the ADA "shall not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a); see also, e.g., Nader v. ABC Television, Inc., 150 Fed. Appx. 54, 56 (2d Cir. 2005); Robertson v. Amtrak/Nat'l R.R. Passenger Corp., 400 F. Supp.

---

16/     (...continued)
      Appx. 54, 55 (2d Cir. 2005); Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003); Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir. 1998); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998); Kennebrew v. New York City Hous. Auth., 01 Civ. 1654, 2002 WL 265120 at *18 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.); Johns-Davila v. City of New York, 99 Civ. 1885, 2000 WL 1725418 at *5 (S.D.N.Y. Nov. 20, 2000) (Peck, M.J.); Pace v. Paris Maintenance Co., 107 F. Supp. 2d 251, 259 (S.D.N.Y. 2000), aff'd, 7 Fed. Appx. 94 (2d Cir. 2001); Williams v. Salvation Army, 108 F. Supp. 2d 303, 311 (S.D.N.Y. 2000); Shields v. Robinson-Van Vuren Assoc., Inc., 98 Civ. 8785, 2000 WL 565191 at *3 (S.D.N.Y. May 8, 2000); McLean-Nur v. Department of Transport., 98 Civ. 819, 2000 WL 297176 at *5 (S.D.N.Y. Mar. 21, 2000).

2d 612, 622 (S.D.N.Y. 2005); Smith v. MABSTOA/NYCTA, 02 Civ. 220, 2005 WL 1123730 at *2 (S.D.N.Y. May 11, 2005); Jurman v. Coca-Cola Bottling Co., 02 Civ. 8960, 2003 WL 21767506 at *1 (S.D.N.Y. July 31, 2003); Toscano v. Nat. Broad. Co., 99 Civ. 10006, 2000 WL 1742097 at *3 (S.D.N.Y. Nov. 28, 2000).[17] "Current drug use is not limited to use on the day of, or within a matter of days or weeks before, the employment action in question. Rather, the provision is intended to apply to illegal use of drugs that has occurred recently enough to indicate that the individual is actively engaged in such conduct." Jurman v. Coca-Cola Bottling Co., 2003 WL 21767506 at *1 (internal quotations omitted).

Evans' medical records indicate that he tested positive for cocaine on September 12, 2004, which was the same day as his unexcused absence from work that ultimately led to his termination from CIDR. (See page 11 above.) Evans' discharge diagnoses from his September 2004 hospital visit were substance induced mood disorder, substance induced psychosis, and cocaine dependence. (See page 13 above.) The medical records are clear that Evans was not currently undergoing nor had finished a substance abuse rehabilitation program; indeed, Dr. Nunez specifically noted in Evans' discharge report that, despite the fact that he was sober as to cocaine use upon leaving the hospital for the treatment of psychosis, he was at a high risk of relapse into cocaine abuse

---

[17] However, the exclusion for current illegal drug users does not extend to an individual who has successfully completed, or is in the process of completing, "a supervised drug rehabilitation program and [who] is no longer engaging in the illegal use of drugs, or has otherwise been rehabilitated successfully and is no longer engaging in such use." 42 U.S.C. § 12114(b); Robertson v. Amtrak/Nat'l R.R. Passenger Corp., 400 F. Supp. 2d at 622-23; Smith v. MABSTOA/NYCTA, 2005 WL 1123730 at *2.

and was unwilling to be referred to an inpatient rehabilitation center as recommended by his doctors. (See page 13 above.)  During his prior hospitalization for substance abuse, on May 12, 2004, Evans stated that he had smoked approximately $300.00 of crack per day since at least 2001.  (See page 10 above.)  CIDR terminated Evans because of his absence from work on September 11-12, 2004 (and prior occasions), which were caused by Evans' drug use.  (See pages 3-7 above.)

It is clear that Evans was currently engaging in the illegal use of drugs at the time of his termination and also at the time of the events leading up to his termination.  Evans therefore cannot qualify as an individual with a disability under the ADA.  See, e.g., Jurman v. Coca-Cola Bottling Co., 2003 WL 21767506 at *1 ("Plaintiff, an active cocaine user at the time of his termination, does not have an ADA-qualifying disability given the statute's express language addressing current drug use."); see also, e.g., Nader v. ABC Television, Inc., 150 Fed. Appx. at 55-56 (employee's termination did not violate the ADA where employee was current drug user at the time of his termination and was terminated because his arrest after selling cocaine to an undercover police officer violated his employment contract's morals clause); Brown v. Lucky Stores, Inc., 246 F.3d 1182, 1187-88 (9th Cir. 2001) (employee fired for being absent from work because of drug use and arrest; "[b]ecause she had not refrained from the use of drugs and alcohol for a sufficient length of time, she was not entitled to the protections of the ADA's safe-harbor provision."); Hoffman v. MCI Worldcom Commc'ns, Inc., 178 F. Supp. 2d 152, 155-56 (D. Conn. 2001) (employee with cocaine and alcohol addiction was not an individual with a disability under the ADA although employee had entered drug treatment program one month prior to the date of his employment termination);

Robertson v. Amtrak/Nat'l R.R. Passenger Corp., 400 F. Supp. 2d at 625-26 (employee's termination did not violate the ADA where employee was using drugs and alcohol leading up to termination and where employee did not provide explanation for his excessive absenteeism).

Because Evans was fired because of absence from work on September 11-12, 2004 related to his cocaine use, he is not protected by the ADA, and CIDR is entitled to summary judgment on this ground alone.

**B.     Evans Was Also Not Disabled Within The Meaning Of The ADA Because He Cannot Show That His Alleged Disability Substantially Limited Any Major Life Activities**

The ADA defines a "disability" as:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); see, e.g., Sutton v. United Air Lines, Inc., 527 U.S. 471, 478, 119 S. Ct. 2139, 2144 (1999).[18/]

_____

[18/]     See also, e.g., Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 563, 119 S. Ct. 2162, 2167 (1999); Capobianco v. City of New York, 422 F.3d 47, 56 (2d Cir. 2005); Jacques v. DiMarzio, Inc., 386 F.3d 192, 199 (2d Cir. 2004); Felix v. New York City Transit Auth., 324 F.3d 102, 104 (2d Cir. 2003); Weixel v. Bd. of Educ. of the City of New York, 287 F.3d 138, 147 (2d Cir. 2002); Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001); Schaefer v. State Ins. Fund, 207 F.3d 139, 142 (2d Cir. 2000); Heyman v. Queens Village, 198 F.3d 68, 72 (2d Cir. 1999); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir. 1998), cert. denied, 526 U.S. 1018, 119 S. Ct. 1253 (1999); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 150 (2d Cir. 1998); Ryan v. Grae & Rybicki, 135 F.3d 867, 870 (2d Cir. 1998); Kennebrew v. New York City Hous. Auth., 01 Civ. 1654, 2002 WL 265120 at *18 (S.D.N.Y. Feb. 26, 2002) (Peck, M.J.); Cobian v. New York City, 99 Civ. 1053, 2000 WL 1782744 at *13 (S.D.N.Y. Dec. 6, 2000) (Peck, M.J.); Johns-Davila v. City of New York, 99 Civ. 1885, 2000 WL1725418 at *5 (S.D.N.Y. Nov. 20, 2000); Douglas v.
(continued...)

The EEOC defines the term "substantially limits" as:

"(i) Unable to perform a major life activity that the average person in the general population can perform; or

"(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."

Heyman v. Queens Village, 198 F.3d at 72 (quoting 29 C.F.R. § 1630.2(j)(1)); see, e.g., Sutton v. United Air Lines, Inc., 527 U.S. at 480, 119 S. Ct. at 2145; Capobianco v. City of New York, 422 F.3d at 56; Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir.), cert. denied, 537 U.S. 813, 123 S. Ct. 74 (2002); Giordano v. City of New York, 274 F.3d at 747; Muller v. Costello, 187 F.3d 298, 312 (2d Cir. 1999); Colwell v. Suffolk County Police Dep't, 158 F.3d at 643; Ryan v. Grae & Rybicki, 135 F.3d at 870; Cobian v. New York City, 2000 WL 1782744 at *13-14; Williams v. Salvation Army, 108 F. Supp. 2d 303, 312 n.11 (S.D.N.Y. 2000).[19]

---

[18]  (...continued)
Victor Capital Group, 21 F. Supp. 2d 379, 390-91 (S.D.N.Y. 1998) (Stein, D.J. & Peck, M.J.); Johnson v. St. Clare's Hosp. & Health Ctr., 96 Civ. 1425, 1998 WL 236235 at *7 (S.D.N.Y. May 13, 1998) (Mukasey, D.J. & Peck, M.J.), aff'd, No. 98-7831, 175 F.3d 1008 (table), 1999 WL 97232 (2d Cir. Feb. 24, 1999).

[19]  The EEOC is primarily responsible for the enforcement of the ADA, and EEOC regulations are accorded great deference in interpreting the ADA. See, e.g., E.E.O.C., v. Staten Island Sav. Bank, 207 F.3d 144, 151 (2d Cir. 2000); Heyman v. Queens Village, 198 F.3d at 72; Muller v. Costello, 187 F.3d at 312 & n.5; Reeves v. Johnson Controls World Servs., Inc., 140 F.3d at 150 & n.3; Ryan v. Grae & Rybicki, 135 F.3d at 870; Lewis v. Hill, 97 Civ. 3213, 2005 WL 292748 at *3 (S.D.N.Y. Feb. 8, 2005); Cobian v. New York City, 2000 WL 1782744 at *14 n.32; Johns-Davila v. City of New York, 2000 WL 1725418 at *5 n.22.

"[M]ajor life activities" are "activities that are of central importance to daily life." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197, 122 S. Ct. 681, 691 (2002); accord, e.g., Capobianco v. City of New York, 422 F.3d at 56; Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d at 47. EEOC regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).[20]

In determining whether an impairment substantially limits a major life activity, three factors are considered: "'(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.'" Colwell v. Suffolk County Police Dep't, 158 F.3d at 643 (quoting 29 C.F.R. § 1630.20(j)(2)); see, e.g., Capobianco v. City of New York, 422 F.3d at 56; Ryan v. Grae & Rybicki, 135 F.3d at 870; Stalter v. Bd. of Coop. Educ. Servs., 235 F. Supp. 2d 323, 329-30 (S.D.N.Y. 2002); Schapiro v. New York City Dep't of Health, 179 F. Supp. 2d 170, 175 (S.D.N.Y.), aff'd, 25 Fed. Appx. 57 (2d Cir. 2001); Cobian v. New York City, 2000 WL 1782744 at *14; Johns-Davila v. City of New York, 2000 WL 1725418 at *6; Muszak v. Sears,

---

[20] See also, e.g., Sutton v. United Air Lines, Inc., 527 U.S. at 480, 119 S. Ct. at 2145; Capobianco v. City of New York, 422 F.3d at 56; E.E.O.C. v. J.B. Hunt Transp., Inc., 321 F.3d 69, 74 (2d Cir. 2003); Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d at 47; Heyman v. Queens Village, 198 F.3d at 73; Reeves v. Johnson Controls World Servs., Inc., 140 F.3d at 150; Ryan v. Grae & Rybicki, 135 F.3d at 870; Lewis v. Hill, 97 Civ. 3213, 2005 WL 292748 at *3; Cobian v. New York City, 2000 WL 1782744 at *14; Johns-Davila v. City of New York, 2000 WL 1725418 at *6; Shields v. Robinson-Van Vuren Assoc., Inc., 98 Civ. 8785, 2000 WL 565191 at *4 (S.D.N.Y. May 8, 2000).

Roebuck & Co., 63 F. Supp. 2d 292, 299 (W.D.N.Y. 1999); Kirkendall v. United Parcel Serv. Inc.,

964 F. Supp. 106, 109-10 (W.D.N.Y. 1997); Hazeldine v. Beverage Media, Ltd., 954 F. Supp. 697,

703 (S.D.N.Y. 1997).

     Not every physical or mental impairment is an ADA disability, because not every

physical or mental impairment substantially limits a major life activity.  See, e.g., 29 C.F.R. Pt. 1630,

App. ("Many impairments do not impact an individual's life to the degree that they constitute

disabling impairments.  An impairment rises to the level of disability if the impairment substantially

limits one or more of the individual's major life activities."); Capobianco v. City of New York, 422

F.3d at 57 ("[T]he mere fact that an impairment requires an individual to perform a task differently

from the average person does not mean that she is disabled within the meaning of the ADA; rather,

there must be a significant restriction."); Colwell v. Suffolk County Police Dep't, 158 F.3d at 641

("[A] plaintiff who showed that he had an impairment and that the impairment affected a major life

activity would nonetheless be ineligible if the limitation of the major life activity was not

substantial."); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d at 151; Roth v. Lutheran

Gen. Hosp., 57 F.3d 1446, 1454 (7th Cir. 1995) ("not every impairment that affect[s] an individual's

major life activities is a substantially limiting impairment"); Ryan v. Grae & Rybicki, 135 F.3d at

870 ("Although almost any impairment may, of course, in some way affect a major life activity, the

ADA clearly does not consider every impaired person to be disabled.  Thus, in assessing whether a

plaintiff has a disability, courts have been careful to distinguish impairments which merely affect

major life activities from those that substantially limit those activities."); Cobian v. New York City,

2000 WL 1782744 at *14; <u>Johns-Davila</u> v. <u>City of New York</u>, 2000 WL 1725418 at *6; <u>Williams</u>

v. <u>Salvation Army</u>, 108 F. Supp. 2d at 311; <u>Douglas</u> v. <u>Victor Capital Group</u>, 21 F. Supp. 2d at 390-

91 (& cases cited therein).

      Evans has never told the Court, much less presented any evidence, how his alleged

disability limits any major life activities.  While the record indicates that Evans suffers from alcohol

and cocaine dependence and intermittent substance induced psychosis (<u>see</u> pages 9-13 above), there

is no evidence as to the effect those conditions have, if any, on Evans' major life activities.

      Of course, "working" is a major life activity.  29 C.F.R. § 1630.2(i); <u>see</u> cases cited

above; <u>see also</u> <u>Bartlett</u> v. <u>New York State Bd. of Law Examiners</u>, 226 F.3d 69, 78-80 (2d Cir. 2000)

(holding that working is a major life activity); <u>Cobian</u> v. <u>New York City</u>, 2000 WL 1782744 at *15

& n.34 (same); <u>Johns-Davila</u> v. <u>City of New York</u>, 2000 WL 1725418 at *7 (same); 29 C.F.R.

§ 1630.2(j)(3)(i) (defining "substantially limits" as applied to working).

      However, while working is a major life activity, Evans testified that his alleged

disability has never prevented him from working at his full time security guard jobs at CIDR and

FJC.  Indeed, he testified at his deposition that he has "always been able to work."  (<u>See</u> page 3

above.)  And he continues to work as a security guard at FJC to this day.  (<u>See</u> page 8 above.)

      As to limitations on any other major life activities, during his stay at the Medical Arts

Center Hospital in May 2004 for alcohol and cocaine detoxification, Evans told his physician that

he did not have any chronic medical problems that interfered with his life and that he financially

supported himself without help.  (<u>See</u> page 10 above.)  Evans also told his Medical Arts Center

Hospital physicians that he did not have any current psychiatric conditions, and an assessing counselor noted that he had no psychiatric history. (See pages 10-11 above.) During his September 2004 hospitalization, Evans earned a near perfect score on a mental status exam that tested his orientation, registration, attention and calculation, recall, and language skills. (See page 12 above.) None of Evans' doctors or counselors at Columbia Presbyterian noted in Evans' September 2004 medical records that he had any trouble with any major life activities. (See generally Evans Medical Records at 000114-207.)

Evans therefore has not presented any evidence that his alleged disability affected any major life activities. See 29 C.F.R. § 1630.2(i). As a result, since Evans has not shown that he was "disabled," he cannot establish a prima facie case of discrimination under the ADA, and CIDR is entitled to summary judgment. See, e.g., Johnson v. City of New York, 326 F. Supp. 2d 364, 368-70 (E.D.N.Y. 2004) (plaintiff with "psychosis" not disabled under the ADA because her condition did not substantially limit working or any other major life activities); Williams v. New York State Dep't of Labor, 98 Civ. 3816, 2000 WL 33175735 at *10-17 (S.D.N.Y. May 25, 2000) (plaintiff with anxiety disorder not disabled under ADA because disorder did not substantially limit working or any other major life activities); Roberts v. N.Y. State Dep't of Corr. Servs., 63 F. Supp. 2d 272, 285-88 (W.D.N.Y. 1999) (plaintiff recovering alcoholic was not disabled under ADA because there was no evidence that alcoholism substantially interfered with his ability to work or perform any other major life activity); Glowacki v. Buffalo Gen. Hosp., 2 F. Supp. 2d 346, 352-53 (W.D.N.Y. 1998) (plaintiff with bipolar disorder psychosis not disabled under ADA because disorder did not

substantially limit any major life activities); <u>Stuart</u> v. <u>Danka Corp.</u>, 986 F. Supp. 741, 744-45 (E.D.N.Y. 1997) (plaintiff recovering alcoholic was not disabled under ADA because alcoholism did not substantially limit any major life activities).

### CONCLUSION

For the reasons set forth above, the Court grants defendant CIDR's summary judgment motion in all respects. The Clerk of Court shall enter judgment for defendant CIDR dismissing plaintiff Evans' complaint.

DATED:     New York, New York
            May 5, 2006


_____
**Andrew J. Peck**
United States Magistrate Judge


Copies to:    Anthony Evans
            J. Cullen Howe, Esq.